UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                      :

MICHAEL FORSTL,                   :

                      :

          Plaintiff,        :

                      :

       -v-                :        24 Civ. 5691 (JPC)

                      :

MORGAN CREEK CAPITAL MANAGEMENT, LLC  :     OPINION AND ORDER
and MARK YUSKO,             :

                      :

         Defendants.     :

                      :
-------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

      Michael Forstl, a resident of Connecticut, brings this diversity action against his former employer and business partner, Mark Yusko, and Morgan Creek Capital Management, LLC ("MCCM"), an investment advisory firm. Plaintiff alleges that a series of contract breaches by MCCM, under Yusko's direction, deprived him of at least hundreds of thousands of dollars. Plaintiff additionally brings claims for a declaratory judgment, tortious interference, promissory estoppel, and breach of the duty of good faith and fair dealing. Defendants seek dismissal for improper venue as well as failure to state a claim, primarily arguing that the relevant contracts did not entitle Plaintiff to the fees he now claims.

      The Court largely agrees and grants Defendants' motion to dismiss in part. The Court dismisses all of Plaintiff's breach-of-contract claims except for the alleged breach arising from Defendants' hiring of Gondola Capital to raise capital for one of the digital asset funds that Plaintiff was promoting. The Court also dismisses Plaintiff's claims of tortious interference and promissory estoppel. The Court does not dismiss the two claims for which Defendants have not argued for dismissal, which seek a declaratory judgment and allege MCCM's breach of its duty of good faith

and fair dealing. As such, the Court grants the motion to dismiss with respect to Counts II through

VII and IX through XIII, and denies the motion with respect to Counts I, VIII, and XIV.

## I. Background[1]

### A. Facts

Plaintiff worked with MCCM and Yusko, its founder, from 2014 until 2023. SAC ¶¶ 9,

20. Yusko is the principal owner of MCCM Group, MCCM's parent company. *Id.* ¶¶ 11-12.

MCCM Group also owns a registered broker dealer, Morgan Creek Capital Distributors, LLC

("MCCD"). *Id.* ¶¶ 13, 29. Neither MCCM Group nor MCCD is a party in this case. For purposes

of this Opinion, "Morgan Creek" refers collectively to MCCM Group, MCCM, and MCCD, as

well their related entities. *See id.* ¶ 14. Plaintiff was "based in" MCCM's Park Avenue office

until the onset of the Covid-19 pandemic in March 2020, and MCCM permanently closed that

---

[1] The Court takes these allegations from the Second Amended Complaint. *See* Dkt. 12 ("SAC"). In considering Defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court accepts the Second Amended Complaint's factual allegations as true and draws all reasonable inferences in Plaintiff's favor. *See Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009). The Court may consider documents attached to the Second Amended Complaint or incorporated into it by reference. *See* Fed. R. Civ. P. 10(c); *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 152 (2d Cir. 2013); *La Vigne v. Costco Wholesale Corp.*, 284 F. Supp. 3d 496, 502 (S.D.N.Y. 2018), *aff'd*, 772 F. App'x 4 (2d Cir. 2019). The Court also may consider "documents . . . of which plaintiffs had knowledge and relied on in bringing suit." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (cleaned up) (emphasizing that a plaintiff's "*reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion"). When a document a court may properly consider contradicts the allegations in the complaint, "the document controls and the court need not accept as true" the complaint's allegations. *Sazerac Co., Inc. v. Falk*, 861 F. Supp. 253, 257 (S.D.N.Y. 1994).

The Court also references information contained in declarations submitted by the parties, but only to the extent relevant to Defendants' motion to dismiss for improper venue. *See Che v. Edlow*, No. 24 Civ. 2793 (MKV), 2025 WL 2695283, at *2 (S.D.N.Y. Sept. 22, 2025) ("[T]he Court may consider materials outside the pleadings in deciding a motion to dismiss for improper venue." (citing *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 355 (2d Cir. 2005), for the proposition that a "court may rely on pleadings and affidavits")).

office in June 2020.  Dkt. 27-1 ("Forstl Decl.") ¶ 4, Exh. 1 (offer letter); Dkt. 22-1 ("Taylor Decl.") ¶ 13.[2]

In 2014, Yusko, on MCCM's behalf, hired Plaintiff as a consultant to raise MCCM's profile, increase its product offerings, and position MCCM to manage more assets.  SAC ¶¶ 22-24.  Yusko soon transitioned Plaintiff from a consultant to an employee.  *Id.* ¶ 26.  MCCM did not hire Plaintiff directly.  Instead, Plaintiff became the Chief Executive Officer of MCCD and, in exchange for a contribution of $1,000,000, Plaintiff received a 20% equity interest in MCCD.  *Id.* ¶¶ 29, 32-34.  "Although Plaintiff's 20% share was of MCCD, and not MCCM Group or MCCM, it was the parties' understanding that Plaintiff was a partner of Morgan Creek entitled to 20% of the profits from the investment strategies that Plaintiff would spearhead."  *Id.* ¶ 35.

A series of agreements governed how Plaintiff would profit from his work at Morgan Creek.  The agreements central to this case are reviewed below, along with a description of Plaintiff's work at Morgan Creek and eventual departure.

### 1.    Amendment No. 4 to MCCD's Operating Agreement and the Fee Agreement

On April 15, 2016, Plaintiff and Yusko executed two documents that created a fee-transfer system that would, according to Plaintiff, allow him to earn "20% of the profits from the investment strategies that [he] would spearhead" for Morgan Creek.  *Id.*  One document was Amendment No. 4 to MCCD's Operating Agreement, *id.* ¶ 57, Exh. D ("Amendment No. 4"), while the second was the Fee Agreement, *id.* ¶ 38, Exh. C ("Fee Agreement").  MCCD was an LLC whose sole member before Plaintiff was MCCM.  *See id.*, Exh. B.  Yusko signed both of

---

[2] The declarant, Nick Taylor, is MCCM's Chief Operating Officer and Chief Financial Officer.  Taylor Decl. ¶ 2.

those documents twice, once each on behalf of MCCM and MCCD.  Fee Agreement at Signature Page; Amendment No. 4 at Signature Page; SAC ¶ 39.

To be eligible for fee transfers to Plaintiff, revenues were required to come from products that were part of what the Fee Agreement called the "Intermediary Business."  Fee Agreement § 2.  Those products would generate revenues for MCCM, which would then transfer some of those funds, subject to the Fee Agreement, to MCCD.  Amendment No. 4 to the Operating Agreement directed MCCD to then transfer those fees—dubbed "Guaranteed Payments"—to Plaintiff within fifteen days of receiving them.  Amendment No. 4, Appendix A § 3; SAC ¶ 59.  Amendment No. 4 also required Plaintiff's prior written consent if any future amendment to MCCD's Operating Agreement or MCCD's Certificate of Formation "would adversely impact" him.  Amendment No. 4, Appendix A § 6; SAC ¶ 60.

The Fee Agreement set out the conditions by which MCCM would transfer funds to MCCD to pass along as Guaranteed Payments to Plaintiff.  Only funds generated by the Intermediary Business would be transferred to MCCD.  SAC ¶¶ 41-54.  The Fee Agreement defined the "Intermediary Business" to include "the provision of product development, consulting, wholesaling, marketing and support services in connection with the sale and/or distribution through broker-dealers and registered investment advisers" of two categories of investment products: (1) the "shares of any registered investment companies described in Sections 3(a) and (b)" of the Fee Agreement (for purposes of this Opinion, "Category One"); and (2) "to the extent permitted by Morgan Creek in its sole discretion, interests in other investment products (including,

but not limited to, exchange-traded funds, index funds and managed accounts)" (for purposes of this Opinion, "Category Two"). Fee Agreement § 2.[3]

At the time of the Fee Agreement's execution, Category One comprised two registered investment companies with a total assets under management ("AUM") of approximately $120 million to $140 million. SAC ¶ 67. The first, an open-ended registered investment company, was the Morgan Creek Tactical Allocation Fund ("Tactical Allocation Fund"). *Id.* ¶ 42; Fee Agreement § 3(a). The second, a closed-end registered investment company, was the Morgan Creek Global Equity Institutional Long-Short Fund ("Long-Short Fund"). SAC ¶ 43; Fee Agreement § 3(b). By contrast, Category Two was empty at the time of the Fee Agreement's execution, and investment products would be added to it only at MCCM's "sole discretion." Fee Agreement § 2; *see* SAC ¶ 31 ("The second type of investment products were new products that Plaintiff would create and distribute for Morgan Creek.").

Whether investment products were in Category One or Two determined how fees would be calculated for the MCCM-to-MCCD transfers. Section 3 of the Fee Agreement governed those calculations. Subsections (a) and (b) provided the formulas for the two kinds of products in Category One, open-ended and closed-end registered investment companies. Fee Agreement § 3(a), (b). Subsection (c) set out the calculation for any product whose revenues, "[s]ubject to [MCCM's] prior written consent," could be sent to MCCD from Category Two. *Id.* § 3(c).

For funds from Category One, MCCM would pay 20%[4] of the registered investment companies' "Net Profits," defined in the Fee Agreement as gross revenues multiplied by an

---

[3] The Fee Agreement excluded certain sources of revenue not relevant here. *See* Fee Agreement § 2.

[4] This is the percentage that the Fee Agreement refers to as the "Company's Percentage." Fee Agreement § 3. It is "equal to the Percentage Interest of [Plaintiff]" at the time of the transfer from MCCM to MCCD. *Id.* At the date of the Fee Agreement, that interest was 20%. *Id.*

"applicable percentage." *Id.* § 3(a), (b). The applicable percentage was based on "the aggregate amount of assets under management ('AUM')" of the registered investment companies. *Id.* § 3. Under this "AUM Threshold" rule, if AUM was $250 million or below, the applicable percentage was 0%; and if AUM was between $250 million and $1 billion, the applicable percentage was 30%, unless AUM did not exceed $250 million by October 31, 2016, in which case it would be 25%. *Id.*[5] Thus, MCCD would not receive any fees generated by Category One companies until the aggregated AUM of those companies crossed the $250 million threshold.[6]

For MCCD to collect fees from Category Two, two things needed to occur. First, as mentioned above, MCCM had to give permission for a product to enter Category Two of the Intermediary Business. *See id.* § 2 ("The 'Intermediary Business' comprises the provision of . . . services in connection with the sale and/or distribution . . . to clients of . . . (ii) *to the extent permitted by Morgan Creek in its sole discretion*, interests in other investment products . . . ." (emphasis added)). Second, MCCM would need to give "prior written consent . . . in its sole discretion" for the fee transfer. *Id.* § 3(c). Only then would MCCM transfer to MCCD 20%[7] of "Net Revenues . . . associated with any future investment products developed and distributed by the Intermediary Business." *Id.* "Net Revenues" was defined as "the gross investment management and performance fee revenues related to the Intermediary Business received by the Morgan Creek Group . . . from the relevant investment companies and products described above

---

[5] While not relevant for present purposes, the Fee Agreement additionally set forth applicable percentages if AUM was greater than $1 billion but less than $2 billion, and if AUM was greater than $2 billion. Fee Agreement § 3.

[6] The Fee Agreement also provided that "Net Profits and Net Revenues shall be calculated in good faith by [MCCM] in accordance with generally accepted account principles as in effect in the United States from time to time, using principles consistently applied by [MCCM] ('GAAP')." Fee Agreement § 3.

[7] This is also referred to as the "Company's Percentage." Fee Agreement § 3.

. . . , reduced by all direct commissions, sales, servicing and distribution fees related to such investment companies and products." *Id.* § 3. Unlike Category One, no AUM Threshold limited the Category Two payments, so MCCD would receive its full share (20%) of Net Revenues from Category Two products regardless of their total AUM. *See id.* § 3(c); SAC ¶ 49.

To protect Plaintiff's interest, the Fee Agreement also included Overriding Provisions that operated "notwithstanding" any other part of the contract. SAC ¶ 51; Fee Agreement § 5. As relevant here, they provided that (i) Plaintiff's 20% interest in MCCD could not be "diluted" except under specific conditions, Fee Agreement § 5(c); SAC ¶ 52; (ii) MCCM would not "directly or indirectly conduct, manage, operate or participate in the Intermediary Business" except through MCCD or another entity in which Plaintiff "shall receive the same rights (economic, voting and otherwise) as he would have if such business had been conducted through [MCCD]," Fee Agreement § 5(g); SAC ¶ 53; (iii) if Morgan Creek were to liquidate or wind up MCCD without replacing it with another entity in which Plaintiff had a sufficient interest, then MCCM "shall make the payments contemplated in Section 3" directly to Plaintiff, Fee Agreement § 5(h); SAC ¶ 54; (iv) MCCM would not "enter any agreements or arrangements . . . which would, directly or indirectly, avoid or circumvent the provisions of the Operating Agreement or this [Fee] Agreement," Fee Agreement § 5(i); SAC ¶ 55; and (v) so long as Plaintiff or a transferee of his entire interest remains a member of MCCD, then the provisions in subsections (g), (h), and (i) of Section 5 would remain in effect after any liquidation and winding up of MCCD as to Plaintiff or his transferee, Fee Agreement § 5(j); SAC ¶ 56.

### 2.     The First Amendment to the Fee Agreement

The Tactical Allocation Fund and the Long-Short Fund—the two registered investment companies that initially constituted the entirety of the Intermediary Business's Category One— underperformed in 2017 because of bad economic conditions. SAC ¶ 69. Yusko closed the

Tactical Allocation Fund without telling Plaintiff, which left in Category One only the Long-Short Fund with an AUM of approximately $70 million. *Id.* ¶ 70. Because MCCD, and thus Plaintiff, would receive transfers from Category One's Net Profits only after it exceeded the AUM Threshold, shutting down the Tactical Allocation Fund "was a significant setback for the $250 million AUM target" of Category One. *Id.* In response to Plaintiff's complaints about the Tactical Allocation Fund's shutdown, Yusko amended the Fee Agreement to add other existing Morgan Creek investment funds to the portfolio of funds that paid fees to MCCD. *Id.* ¶ 72.

Executed November 18, 2016, the First Amendment to the Fee Agreement created a category of such investment products to be included in the Intermediary Business "[i]n addition to the sales of the shares and other investment products detailed in section 2 (i) and (ii) of the Fee Agreement," *i.e.*, Categories One and Two. Dkt. 22-2 ("First Amendment").[8] These products (for purposes of this Opinion, "Category Three") are identified in the First Amendment's Appendix A. First Amendment § 2; *id.*, Appendix A; *see* SAC ¶ 73. The First Amendment provided that MCCM would pay MCCD 20%[9] "of Net Profits arising from the sale of" the investment products in Category Three. First Amendment § 2. It stated that "capitalized terms not defined [in the First

---

[8] Defendants ask the Court to consider the First Amendment "because Plaintiff attached partial excerpts of the First Amendment . . . to his Second Amended Complaint without attaching the full document." Motion at 7 n.4. They are correct that Plaintiff's Second Amended Complaint attached two versions of "'Appendix A' to the Fee Agreement." *See* SAC ¶¶ 73-79, Exhs. E, F. The original Fee Agreement did not have an Appendix A. *See generally* Fee Agreement. Appendix A is a part of the Fee Agreement by operation of the First Amendment. Therefore, by referring in his Second Amended Complaint to Appendix A and its amended versions—*see* SAC ¶¶ 73-79, Exhs. E, F—Plaintiff implicitly also relies on the First Amendment, so the Court may consider it without converting Defendants' motion to dismiss into a motion for summary judgment. *See In re Hunter Env't Servs. Inc. Sec. Litig.*, 921 F. Supp. 914, 917-18 (D. Conn. 1996) (collecting cases). Plaintiff does not challenge the Court's consideration of the First Amendment. *See* Opposition at 11.

[9] Like in the Fee Agreement, the First Amendment uses "Company's Percentage," First Amendment § 2, which amounted to 20%.

Amendment] hav[e] the meaning given such terms in the Fee Agreement." *Id.*, Whereas Clause. Thus, fee payments from Categories One and Three would be calculated the same way— determining the value of Net Profits, as defined by Section 3 of the Fee Agreement, and transferring 20% of that amount. *See id.* § 2; Fee Agreement § 3(a), (b).

Yusko and Plaintiff twice revised the list in Appendix A. *See* SAC ¶¶ 74, 77, 108, Exhs. E ("August 2017 Appendix A"), F ("February 2018 Appendix A"). The February 2018 revision added the Morgan Creek Blockchain Opportunities Fund, LP ("MCBO I"). February 2018 Appendix A; *accord* SAC ¶ 79.[10]

### 3. Defendants' Alleged Reductions in Fee Transfers to MCCD

All of Morgan Creek's broker-dealer activities ran through MCCD. SAC ¶ 66. Plaintiff "hired, trained, and mentored a team of three investment sales professionals." *Id.* ¶ 62. Over his first few years at MCCD, Plaintiff oversaw a variety of investment products: the registered investment companies that constituted Category One, and what his Second Amended Complaint calls the "MCCD Products," *i.e.*, "[a]ll other investment products overseen by Plaintiff." *Id.* ¶ 46. Among the MCCD Products were various new investment products that he developed or distributed for Morgan Creek, including private equity-style funds, hedge fund-style funds, funds that invested in digital assets, opportunities to invest in private companies' funding rounds through special purpose vehicles, and two exchange-traded funds. *Id.* ¶¶ 80-88.

Defendants did not send fees to MCCD from the MCCD Products. *Id.* ¶ 91. Plaintiff believes that the MCCD Products began generating Net Revenues in the second quarter of 2018, and by the fourth quarter of 2020 they were generating $275,000 in Net Revenues per quarter. *Id.*

---

[10] Plaintiff explains that MCBO I was a "digital asset fund . . . , which invested in digital asset companies, cryptocurrency companies, companies involved in the ecosystem around digital assets, other digital funds, and cryptocurrency itself." SAC ¶ 83.

¶¶ 94-95.  But no revenues were transferred to MCCD, even though, according to Plaintiff's understanding, the Fee Agreement required MCCM to pay 20% of Net Revenues to MCCD for his ultimate benefit.  *See id.* ¶¶ 96, 104.

In 2021, Plaintiff noticed that the quarterly financial summary of MCCD Products had a new column titled "% related to [Plaintiff]."  *Id.* ¶ 100.  It revealed that MCCM did not credit Plaintiff with all the revenue from several investment funds that he had supervised or launched.  *See id.* ¶ 101.  Plaintiff challenged the allocations, and "Defendants simply responded by noting that there were other people involved with these funds that needed to be paid."  *Id.* ¶ 103.

Plaintiff also came to understand that Morgan Creek was not crediting to him the performance fees and management fees earned from all investors in MCCD Products.  *Id.* ¶¶ 108-113.  In one case, Plaintiff obtained investments from pension plans out of Fairfax County, Virginia, into three of the MCCD Products funds.  *Id.* ¶¶ 114-116.  Defendants refused to credit Plaintiff for the investment into the third fund.  *Id.* ¶ 117.  They also refused to credit Plaintiff for later investments that Fairfax County made even though Plaintiff had generated the relationship.  *Id.* ¶ 118.

Plaintiff alleges another reason that he did not receive all the fees owed to him was that Defendants were calculating AUM using a benchmark that depressed the total amount of assets, thereby keeping him from meeting the $250 million AUM Threshold.  Plaintiff alleges that he "had understood that AUM for several [of] the funds, including MCBO I and MCBO II[11], was calculated using" net asset value ("NAV"), but after the third quarter of 2021, he learned that Defendants calculated AUM using committed capital instead.  *Id.* ¶ 146.  Committed capital tends

---

[11] Plaintiff alleges that, in late 2019, he oversaw the launch of Morgan Creek Blockchain Opportunity Fund II, LP ("MCBO II"), a "digital asset fund with similar types of investments" as MCBO I.  SAC ¶ 84.

to be lower than NAV, because committed capital is the amount of money originally invested in the fund while NAV reflects a fund's net assets less its liabilities and is recalculated every quarter. *Id.* ¶¶ 144-145.  If a fund's value increased after initial investment, NAV would be higher than committed capital, in which case the $250 million AUM threshold would be reached sooner by using NAV.

### 4.    Defendants' Hiring of Placement Agents

Starting in approximately 2018, MCCM hired several placement firms to raise funds and promote sales of MCCM's investment products.  *Id.* ¶¶ 119-125.  An alternative investment firm, Gondola Capital, was hired to raise assets for MCBO I.  *Id.* ¶ 120.  Trailmark, a private capital placement firm, was assigned to be the primary sales team for the digital asset funds, and Yusko prohibited Plaintiff and his team from pursuing new investors for one of those funds, MCBO II. *Id.* ¶¶ 122-123.  A securities brokerage platform called Frontier Solutions, LLC, raised assets for various other Morgan Creek funds.  *Id.* ¶ 125.

### 5.    The Commission Agreement

In January 2022, Plaintiff signed a Commission Agreement, dated November 29, 2021, to "receive some source of income and help recoup at least some portion of his $1 million investment in the firm."  *Id.* ¶ 127; *see* Dkt. 22-4 ("Commission Agreement").[12]  It took retroactive effect starting September 10, 2021.  Commission Agreement at 1.  The Commission Agreement detailed the commission rates Plaintiff would earn for "sales to new relationships or new capital," and it stated that Plaintiff would earn them only while "a registered representative of Morgan Creek."

---

[12] The Complaint identifies a "Commission Agreement" signed "on or about the end of 2020 or early 2021." SAC ¶ 127.  Defendants refer to that document as the "Rev. Commission Agreement."  Motion at 12.  Both terms refer to the document at Docket Number 22-4.  *See id.*; Opposition at 19.

*Id.*, Attachment A at 1.  In the event Plaintiff stopped being a registered representative of Morgan Creek, he would also "cease to be paid any commissions other than related to carried interest on Deals."  *Id.*

After he signed that agreement, Plaintiff secured an investment from the Virginia Pooled Retirement Fund that, as alleged, entitled him to a $230,000 commission.  SAC ¶ 129.  But MCCM instead awarded him only half that amount because it assigned the other half to a junior analyst who, Defendants said, had worked with Plaintiff to secure that investment.  *Id.* ¶ 130.

### 6.    Plaintiff's Departure from Morgan Creek, Yusko's Promise, and MCCD's Wind-Up

In August 2022, Defendants "suddenly informed" Plaintiff that the salaries of Plaintiff and his entire team would be reduced by 50% beginning in October 2022 and, after December 31, 2022, "eliminated."  *Id.* ¶ 169.  Defendants also urged Plaintiff to replace his Fee Agreement with a "placement agency agreement," which Plaintiff declined.  *Id.* ¶ 171.

Plaintiff could not work without a salary, so he and two team members "decided to leave Morgan Creek for Exos, [a] company that Plaintiff had introduced MCCM to through Plaintiff's relationships with one of its partners."  *Id.* ¶ 172.  As Plaintiff prepared to leave Morgan Creek, Yusko "promised plaintiff that he would continue to receive the quarterly commissions he was owed under the Commission Agreement."  *Id.* ¶ 270; *accord id.* ¶ 173.  Plaintiff accounted for those expected commissions when negotiating with Exos and "accepted less compensation from Exos than he would have had he not anticipated receiving the commission."  *Id.* ¶ 271; *accord id.* ¶ 173.  But then Yusko reneged, "arguing that, as Plaintiffs and the others were no longer employees of Morgan Creek, the company no longer had any obligation" to pay them commissions.  *Id.* ¶ 173.

Plaintiff claims he was constructively terminated by Morgan Creek effective January 1, 2023. *Id.* ¶ 174. The only payments Defendants made to Plaintiff between November 2015 and Plaintiff's termination were his salary, the commission payment for securing an investment from the Virginia Pooled Retirement Fund, a one-time bonus for securing a particular investment, and nominal bonuses. *Id.* ¶ 175; *see id.* ¶¶ 129-130, 168. It is unknown if MCCM ever transferred funds to MCCD. *Id.* ¶ 176. Regardless, Plaintiff never received any share of Net Revenues or Net Profits from the MCCD Products. *Id.*

Defendants "began winding up MCCD" soon after Plaintiff's departure. *Id.* ¶ 177. MCCD is still registered in Delaware, but no longer with the SEC. *Id.* ¶ 179. Since then, Defendants have shut down some of the funds that Plaintiff oversaw while he ran MCCD and transferred their investors to other Morgan Creek funds. *Id.* ¶ 180.

## B. Procedural History

Plaintiff filed this action on July 26, 2024. *See* Dkt. 1. He amended his Complaint for the first time five days later, Dkt. 8, and he filed his Second Amended Complaint on August 7, 2024, Dkt. 12. Plaintiff pleads fourteen counts.

Count I seeks a declaratory judgment that: (i) the AUM Threshold applies only to the open-ended and closed-end registered investment companies (*i.e.*, Category One) and not to the MCCD Products; (ii) Plaintiff's share of fees should be calculated using NAV when the fees charged to clients by MCCM are based on NAV; (iii) Plaintiff's fees should be calculated based on total NAV (or committed capital, where appropriate), not just the NAV or committed capital from certain investors; (iv) Plaintiff is entitled to carried interest earned by the MCCD Products; and (iv) Plaintiff is entitled to 20% of the MCCD Products' Net Revenues without any deductions. SAC ¶¶ 182-186.

Counts II through X concern the Fee Agreement and Amendment No. 4 of MCCD's Operating Agreement. Counts II through VII allege that MCCM breached the Fee Agreement and Amendment No. 4 in multiple ways based on how it applied the AUM Threshold, credited to Plaintiff fees and revenues, and ultimately failed to transfer fees originating from the revenue generated by the MCCD Products. *Id.* ¶¶ 187-237. Count VIII alleges that MCCM breached the Fee Agreement by hiring placement agents that competed with Plaintiff, in violation of Section 5(i) of that agreement. *Id.* ¶¶ 238-244. Count IX alleges that MCCM breached the Fee Agreement and Amendment No. 4 of MCCD's Operating Agreement by (i) winding down MCCD and moving the Intermediary Business to another broker-dealer; (ii) winding down MCCD without Plaintiff's prior written consent, even though the wind-down adversely affected him; (iii) closing certain funds overseen by Plaintiff "as MCCD Products"; and (iv) closing down MCCD without Plaintiff's consent as a member of MCCD. *Id.* ¶¶ 245-256. Count X alleges that Yusko tortiously interfered with the Fee Agreement by causing MCCM to breach it. *Id.* ¶¶ 257-262.

Counts XI through XIII relate to the Commission Agreement. Counts XI and XIII arise from MCCM's reallocation of half of Plaintiff's commission for the investment he procured from the Virginia Pooled Retirement Fund. Count XI alleges that MCCM breached the Commission Agreement in doing so, *id.* ¶¶ 263-268, and Count XIII alleges that Yusko tortiously interfered with the Commission Agreement by inducing MCCM to do so, *id.* ¶¶ 275-279. Count XII alleges that MCCM and Yusko owe Plaintiff commissions under the doctrine of promissory estoppel. *Id.* ¶¶ 269-274.

Finally, Count XIV alleges that MCCM breached its duty of good faith and fair dealing by suppressing AUM figures for purposes of calculating the AUM Threshold in a way that "prevented

Plaintiff from receiving the benefit of the bargain he negotiated" in the various compensation agreements. *Id.* ¶¶ 280-286.

Defendants moved to dismiss on October 14, 2024, on grounds of improper venue under Federal Rule of Civil Procedure 12(b)(3) and, alternatively, for failure to state a claim under Rule 12(b)(6). *See* Dkts. 22, 23 ("Motion"). Plaintiff opposed that motion on November 4, 2024, Dkt. 27 ("Opposition"), and Defendants filed their reply on November 18, 2024, Dkt. 28 ("Reply").

## II. Legal Standard

### A. Rule 12(b)(3) Standard

A motion to dismiss under Rule 12(b)(3) asserts that venue is "improper." Fed. R. Civ. P. 12(b)(3). "Once an objection to venue has been raised, plaintiff bears the burden of proving that venue is proper." *Catlin Indem. Co. v. New England Law/Boston*, No. 15 Civ. 4836 (JMF), 2016 WL 447849, at *2 (S.D.N.Y. Feb. 4, 2016) (cleaned up). In assessing whether venue is proper for purposes of Rule 12(b)(3), courts in this Circuit apply the same standard of review as for a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2): "If the court chooses to rely on pleadings and affidavits, the plaintiff need only make a *prima facie* showing of venue." *Gulf Ins. Co.*, 417 F.3d at 355 (cleaned up). "In analyzing whether the plaintiff has made the requisite prima facie showing that venue is proper, [courts] view all the facts in a light most favorable to plaintiff." *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 384 (2d Cir. 2007).

### B. Rule 12(b)(6) Standard

To survive a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court

to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although the Court must "accept[] as true the factual allegations in the complaint and draw[] all inferences in the plaintiff's favor," *Biro v. Condé Nast*, 807 F.3d 541, 544 (2d Cir. 2015), it need not "accept as true legal conclusions couched as factual allegations." *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475-76 (2d Cir. 2009).

### III. Discussion

#### A. Venue

"Where no defendant resides in the district where the civil action is brought," as appears to be the case here, SAC ¶¶ 10-12; Motion at 26, venue is proper in "'a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.'" *Smart Shoppers NY LLC v. Tylers Coffee LLC*, No. 22 Civ. 4969 (NSR), 2024 WL 113731, at *6 (S.D.N.Y. Jan. 10, 2024) (quoting 28 U.S.C. § 1391(b)(2)). Venue may be proper in "multiple judicial districts as long as 'a substantial part' of the underlying events took place in those districts." *Gulf Ins. Co.*, 417 F.3d at 356. Under this framework, a district court is not required "to determine the best venue," *Bates v. C & S Adjusters*, 980 F.2d 865, 867 (2d Cir. 1992), so long as "*significant* events or omissions *material* to the plaintiff's claim . . . occurred in the district in question, even if other material events occurred elsewhere," *Gulf Ins. Co.*, 417 F.3d at 357.

Venue must be proper for each claim and each defendant. *Smart Shoppers NY*, 2024 WL 113731, at *7. The analysis proceeds in two parts. The court must (1) "identify the nature of the claims and the acts or omissions that the plaintiff alleges give rise to those claims" and (2) "determine whether a substantial part of those acts or omissions occurred in the district where the suit was filed." *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 432 (2d Cir. 2005). The

16

Second Circuit has emphasized that "'[s]ubstantiality' for venue purposes is more a qualitative than a quantitative inquiry, determined by assessing the overall nature of the plaintiff's claims and the nature of the specific events or omissions in the forum, and not by simply adding up the number of contacts." *Id.* at 432-33. So when "material acts or omissions within the forum bear a close nexus to the claims, they are properly deemed 'significant' and, thus, substantial, but when a close nexus is lacking, so too is the substantiality necessary to support venue." *Id.* at 433 (citing *Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1372 (11th Cir. 2003)).

The venue analysis for a contract claim examines "not only where the contract was negotiated or executed, but also where it was to be performed, and where the alleged breach occurred." *Michaels v. Drexler*, No. 20 Civ. 1776 (RA), 2020 WL 6825692, at *3 (S.D.N.Y. Nov. 20, 2020) (cleaned up); *see Smart Shoppers NY*, 2024 WL 113731, at *8 (stating that "negotiation and performance of the agreement go to the heart of a contract claim" (cleaned up)). The inquiry does not stop at a determination of where the injury was felt. *See Astor Holdings, Inc. v. Roski*, No. 01 Civ. 1905 (GEL), 2002 WL 72936, at *8 (S.D.N.Y. Jan. 17, 2002) ("If, for example, a defendant by actions in California interfered with a business opportunity that existed in New York, the harm which the tort contemplates would occur here. But if the economic loss that resulted was inflicted on a corporation in Georgia, for example, that alone would not be sufficient for venue in Georgia, else plaintiffs could always sue in their home forum."); *accord Six Dimensions, Inc. v. Perficient, Inc.*, No. 15 Civ. 8309 (PGG), 2017 WL 10676897, at *7 (S.D.N.Y. Mar. 28, 2017). When the location of a breach is hard to pin down, a court may focus instead on where performance was due. *See Smart Shoppers NY*, 2024 WL 113731, at *7.

Applying these standards, this District is the proper venue for the Plaintiff's claims concerning the Fee Agreement, but not for those that arise from the Commission Agreement.

Plaintiff has made a *prima facie* showing that Defendants' material acts in this District have a clear nexus to his claims that they breached the Fee Agreement. By the time the parties negotiated and executed the Fee Agreement, Plaintiff already had been working for over a year in MCCM's Manhattan office. *See* Forstl Decl. ¶ 4. MCCM appeared to expect that much of Plaintiff's performance under the contract would occur in this District, as its offer letter to Plaintiff advised that he would be "based in" that Manhattan office. Forstl Decl., Exh. 1. Plaintiff in fact performed much of his work there until the onset of the Covid-19 pandemic in March 2020. Taylor Decl. ¶ 13; Forstl Decl. ¶ 4. There, he developed and marketed investment products to generate revenues that, he alleges, should have ultimately been transferred to him. SAC ¶¶ 26, 63-65; *see* Forstl Decl. ¶¶ 4, 9. As alleged, Yusko traveled to New York for multiple meetings with Plaintiff and prospective investors. SAC ¶ 63; *see* Forstl Decl. ¶ 8. MCCM was maintaining that office as Plaintiff's base when the parties amended the Fee Agreement, permitting an inference that he was there while the amended agreement was negotiated and executed. *See* SAC ¶ 26; Taylor Decl. ¶ 6. And that Manhattan office also hosted Morgan Creek's team that managed a registered investment company, the Long-Short Fund, that was a source of fees Plaintiff could earn under the Fee Agreement. Forstl Decl. ¶ 7; *see* SAC ¶ 30; Fee Agreement § 3(b).

Defendants ask the Court to look at their actions through a soda straw and disregard what they did outside North Carolina. But Defendants' decisions in North Carolina had a clear connection to the revenues they earned in Manhattan, Plaintiff's work in Manhattan, and the effects of their decisions on their business and on Plaintiff outside of their home state. Indeed, the logical extension of Defendants' position would be that venue is improper anywhere except the District they were in when deciding how to calculate Plaintiff's compensation and otherwise manage Morgan Creek. *See* Reply at 9-10; *see generally* Taylor Decl. Not so. Courts in this District have

consistently considered the location of the party affected by a defendant's acts or omissions, and in breach-of-contract cases, where the contract was negotiated, executed, expected to be performed, in fact performed, and breached. *See, e.g.*, *Michaels*, 2020 WL 6825692, at *3 (holding that venue is proper where the contract was to be performed, and was in fact performed, even though it was negotiated elsewhere); *ESI, Inc. v. Coastal Power Prod. Co.*, 995 F. Supp. 419, 425 (S.D.N.Y. 1998) ("Venue may be proper in the district where the contract was substantially negotiated, drafted, and/or executed, even if the contract was not to be performed in that district and the alleged breach occurred elsewhere."); *Palmore v. Napoli Shkolnik PLLC*, No. 23 Civ. 1616 (ER), 2024 WL 1330003, at *9 (S.D.N.Y. Mar. 28, 2024) (noting that venue can be proper where the plaintiff received communications if the communications are "sufficiently relate[d] to the cause of action" (cleaned up)); *see also Siegel v. Ford*, No. 16 Civ. 8077 (JPO), 2017 WL 4119654, at *7 (S.D.N.Y. Sept. 15, 2017) (finding venue proper in a fraud claim where the plaintiff was in Manhattan when he spoke on phone to the defendant, who was not; the plaintiff and the defendant met several times in Manhattan; and the defendant mailed items to the plaintiff in Manhattan).

Defendants rely on several cases that are distinguishable. *See* Reply at 9. First, the court in *Catlin Indemnity Company* held that venue was improper in the Southern District of New York because none of the acts or omissions giving rise to a material misrepresentation claim took place in the District. 2016 WL 447849, at *2. The plaintiff insurer (in Atlanta) alleged that the defendant (in Boston) made a misrepresentation when filling out an insurance application that was relied on by the insurer's agent (in Nassau County, in the Eastern District of New York) that issued a policy to the defendant. *Id.* at *1. Months later, employees in the insurer's Manhattan office denied an insurance claim filed by the defendant. *Id.* The insurer sued in the Southern District of New York for a declaration that the alleged misrepresentation meant that it had no obligation to defend or

indemnify the defendant. *Id.* The court held that venue was improper because, though the insurance claim was denied in this District, all the acts necessary to establish the misrepresentation and reliance—the grounds for liability—took place somewhere else. *Id.* at *2. In other words, the claim in *Catlin Indemnity Company* was established without regard for the one immaterial event that took place in the forum, so venue was improper. By contrast, the Fee Agreement claims concern breaches that allegedly occurred only after Defendants hired Plaintiff to work in this District, obtained revenue that was earned there, held meetings with Plaintiff there, and revised its contracts with him while he worked there, all over the course of a years-long contract.

Also unpersuasive is Defendants' reliance on *Palmore*. *See* Reply at 9. The district court's reasoning in *Palmore* was consistent with this Court's analysis here. The court recognized that, for claims of a hostile work environment and retaliation, "[c]ommunications transmitted to the district where the suit is filed can satisfy the Section [1391(b)(2)] standard, assuming those communications sufficiently relate to the cause of action," but held that venue nevertheless was improper as to the individual defendants because the plaintiff failed to plead sufficient facts showing that they transmitted communications into the relevant District. *Palmore*, 2024 WL 1330003, at *9 (cleaned up). As for the defendant law firm, the plaintiff failed to satisfy the second prong of the *Daniel* test because she showed that she faced discriminatory harassment and retaliation while working in an office only outside the forum, not also while she worked in the defendant's office that was located in the District. *Id.* at *10.

The two other cases Defendants cite also are inapposite. *See* Reply at 9. The Second Circuit in *Daniel* held that venue was improper when the defendant's only contacts with the forum were mail communications to just six of the 176 named plaintiffs in the case, and thus insignificant. 428 F.3d at 434. In *Prospect Capital Corp. v. Bender*, venue was improper where the defendants'

contact with the forum was limited to phone calls and emails.  No. 09 Civ. 826 (HB), 2009 WL 4907121, at *4-6 (S.D.N.Y. Dec. 21, 2009).  Neither case involved a contract that contemplated performance in the forum, not to mention an office that the defendants operated in the forum or revenues generated there.

Because venue is proper for the claims alleging breach of the Fee Agreement, it follows that this District is also a proper venue for Plaintiff's declaratory judgment claim, as well as his claim that Yusko tortiously interfered with the Fee Agreement.  *See Cosa Xentaur Corp. v. Bow*, No. 13 Civ. 2912 (JS), 2014 WL 1331030, at *8 (E.D.N.Y. Mar. 31, 2014) (finding venue proper for a claim seeking a declaratory judgment based on a contract for which venue was proper for a breach-of-contract claim).  Both "require[] a preexisting contract"—namely the Fee Agreement, and in the case of the tortious-interference claim, also Amendment No. 4 of MCCD's Operating Agreement—with "substantial connections" in the District.  *See Astor Holdings*, 2002 WL 72936, at *9.  For a tortious-interference claim, "venue is generally premised on where the wrongful conduct took place, as opposed to where the economic loss caused by the misconduct was felt." *Six Dimensions*, 2017 WL 10676897, at *6; *accord Astor Holdings*, 2002 WL 72936, at *8.  But the connection to this District is not limited to the fact that Plaintiff felt the misconduct here.  While Yusko's decisions in North Carolina may have led to the alleged tortious interference, *see* Taylor Decl. ¶¶ 16-22, the foundation of the claim is the alleged breaches of the Fee Agreement and Amendment 4, which are closely linked to this District, as discussed above.  Thus, "*significant* events or omissions *material* to the plaintiff's claim" took place here, "even if other material events occurred elsewhere."  *Gulf Ins. Co.*, 417 F.3d at 357.

Plaintiff's claims arising from the Commission Agreement do not fare as well, however, because that contract has no connection to this District.[13]   When the parties executed the Commission Agreement in January 2022, MCCM's office in Manhattan already had been closed for eighteen months.  *See* Taylor Decl. ¶¶ 10, 13.  There is no indication that the Commission Agreement contemplated Plaintiff's performance in New York, as opposed to in Connecticut where he lived.  *See* Commission Agreement at 1; SAC ¶ 9.  And Plaintiff does not submit any evidence suggesting he carried out his work in New York after MCCM closed its office.  Thus, venue is improper for Plaintiff's claims that MCCM breached the Commission Agreement and that Yusko tortiously interfered with that agreement, as alleged in Counts XI and XIII.

Count XII, which alleges promissory estoppel, fails by similar logic, as it too lacks allegations of significant acts or omissions that occurred in this District.  Defendants' alleged promise was made long after Plaintiff stopped working in New York, and nothing in the Second Amended Complaint or any evidence submitted supports an inference that significant events material to the promissory-estoppel claim took place in the District.

Accordingly, venue is proper for Counts I through X and XIV, and improper for Counts XI through XIII.  The Court need not determine whether to dismiss or transfer the claims for which venue is improper.  Defendants move in the alternative to dismiss for failure to state a claim, and, as explained at *infra* III.B, the Court dismisses the claims implicating the Commission Agreement

---

[13] The relevant Commission Agreement was executed in 2022.  The parties had agreed to previous terms governing commissions in 2016, which Defendants attached to their Motion.  *See* Dkt. 22-3.  But the Court is unable to consider the 2016 agreement at the present stage because Plaintiff does not mention it in his Second Amended Complaint.  Nor would any prior agreement as to commissions appear to have relevance as to venue for Plaintiff's claims specifically concerning the Commission Agreement.

on that basis.  *See Daniel*, 428 F.3d at 436 ("[C]ourts will not waste judicial resources by transferring a case that is clearly doomed." (cleaned up)).

### B. Sufficiency of Plaintiff's Claims

The Court now considers the merits of Plaintiff's causes of action, addressing in turn the breach-of-contract claims, the tortious-interference claims, the promissory-estoppel claim, and the two claims for which Defendants have not argued for dismissal.

#### 1. Breach of the Fee Agreement and Commission Agreement

Plaintiff alleges breach of contract in nine of his Counts.  Counts II through IX concern the Fee Agreement (and in some of those cases, also MCCD's Operating Agreement).  The other claim, Count XI, alleges a breach of the Commission Agreement.

The parties agree that Delaware law governs the Fee Agreement, so the Court looks to Delaware for the elements of a breach of contract for Counts II through IX.  Motion at 17 n.9; Opposition at 3.  Under Delaware law, to establish a breach of contract, "'the plaintiff must demonstrate: first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff.'"  *Diaz-Roa v. Hermes Law, P.C.*, 757 F. Supp. 3d 498, 559 (S.D.N.Y. 2024) (quoting *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003)).  "'The proper construction of any contract is purely a question of law.'"  *Darnis v. Raytheon Techs. Corp.*, No. 22-2861-cv, 2023 WL 4945093, at *2 (2d Cir. Aug. 3, 2023) (summary order) (quoting *Exelon Generation Acquisitions, LLC v. Deere & Co.*, 176 A.3d 1262, 1266-67 (Del. 2017)).  The Court interprets "contract terms according to their plain, ordinary meaning" unless there is ambiguity.  *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012).  "Contract language is not ambiguous merely because the parties dispute what it means.  To be ambiguous, a disputed contract term must be fairly or reasonably susceptible to more than one meaning."  *Id.*

Of the eight causes of action related to the Fee Agreement, all but one of them fail to state a claim, so the motion to dismiss is granted with respect to Counts II through VII and IX pursuant to Rule 12(b)(6).  The motion is denied with respect to Count VIII, for which Plaintiff has plausibly alleged a breach of the Fee Agreement.  Plaintiff did not plead sufficient facts to allege a breach of the Commission Agreement for the simple reason that the wrong party is named as the Defendant for that alleged breach, so the Court dismisses Count XI.

### i.        Counts II Through VII

Most of Plaintiff's breach-of-contract claims concerning the Fee Agreement fail due to his mischaracterization of Sections 2 and 3, and, specifically, what investment products fall under Section 3(c).  Counts II through VII all rely on Plaintiff's erroneous assumption that MCCD should have received, under Section 3(c), 20% of Net Revenues of what Plaintiff calls the MCCD Products—that is, "[a]ll . . . investment products overseen by Plaintiff" other than those in Category One.  SAC ¶ 46.  But that is not what the Fee Agreement says.

Plaintiff argues that the Fee Agreement required MCCM to pay fees to MCCD from (i) Net Profits of the open-ended registered investment companies; (ii) Net Profits of the closed-end registered investment companies; and (iii) Net Revenues of the MCCD Products.  Opposition at 11.  Thus, he argues, he is entitled to a share of the fees generated by the numerous products developed under his supervision, via MCCM's fee payments to MCCD.[14]  He explains that he did

---

[14] Plaintiff appears to embrace a more limited view of which products' revenues he is entitled to via Section 3(c) in his brief opposing dismissal than he does in the Second Amended Complaint.  *See* Opposition at 12.  In that brief, he insists that his position is not "that every fund that he unilaterally chose to work on should be automatically included" in the Intermediary Business, rather that he seeks to include funds formed as a result of his introductions, funds "created and launched through Plaintiff's efforts," funds "marketed and sold by Plaintiff and his team," and investments that "were legally required to go through MCCD," as Morgan Creek's only registered broker dealer.  *Id.* (cleaned up).  This narrowed argument still suffers from the same flaws discussed above.

not get that share because MCCM breached the Fee Agreement, and for some claims MCCD's Operating Agreement, by: applying the AUM Threshold to the MCCD Products (Count II), discounting the fees payable to him (Count III), failing to credit him various investments and fees and miscalculating Net Revenues (Counts IV, V, and VI), and failing to pay the sums owed within the requisite fifteen days from receipt of the management and performance fees (Count VII). Opposition at 14-18.

The flaw with these theories is simple.  Section 3(c) permitted fee transfers only of investment products in Category Two of the Intermediary Business.  As discussed above, MCCM had sole discretion whether to add any products into that category and, once it did, it had to give written consent before transferring any of their Net Revenues to MCCD.  *See* Fee Agreement §§ 2, 3(c).  Plaintiff, however, disregards that fee transfers from that category were "[s]ubject to [MCCM's] prior written consent," *id.* § 3(c), and that MCCM had discretion whether to put products into Category Two in the first place, *id.* § 2.  Instead, he argues that the MCCD Products—meaning everything he oversaw except for the registered investment companies provided for in Sections 2, 3(a), and 3(b)—automatically entered Category Two and, to the extent they generated Net Revenues, should have prompted MCCM to send 20% of them to MCCD.

The problem for Plaintiff is that, as revealed by his own allegations, the MCCD Products never entered the Intermediary Business.  Plaintiff does not allege that MCCM gave permission to add any so-called MCCM Products into the Intermediary Business's Category Two pursuant to Section 2 of the Fee Agreement, or that MCCM gave "prior written consent" to transfer fees to MCCD from any Category Two products pursuant to Section 3(c).  Plaintiff responds that the quarterly reports listing various MCCD Products and their respective AUM and fees constitute that consent, but those quarterly reports do not do so on their face and Plaintiff fails to allege any

facts in support of that assertion. *See* Opposition at 12; SAC, Exhs. H-J. Thus, the many kinds of investment products that Plaintiff claims constitute the MCCD Products never entered Category Two under Section 2, nor were their revenues qualified for transfers under Section 3(c). Plaintiff, therefore, was not entitled to their revenues under the Fee Agreement, so withholding them from him was not a breach.

This is fatal for Counts II through VII. In Count II, Plaintiff alleges a breach of contract by virtue of MCCM's application of the AUM Threshold to the MCCD Products. SAC ¶¶ 187-195. He contends that MCCM "treat[ed] the MCCD Products as if they were subject to the AUM Threshold and refus[ed] to pay MCCD, and in turn Plaintiff, any Net Profits from the . . . registered investment companies advised by Morgan Creek, or any Net Revenues from the MCCD Products, until the combined AUM of the . . . registered investment companies advised by Morgan Creek and [the] MCCD Products surpassed $250 million." *Id.* ¶ 192. But Plaintiff has not shown that he was entitled to either payment. First, as explained above, MCCM did not owe MCCD or Plaintiff any revenues from the MCCD Products because it never consented to add them to the Intermediary Business or to transfer their revenue to MCCD. Second, Plaintiff fails to show how MCCM applied the AUM Threshold to the MCCD Products. Indeed, because the MCCD Products were not part of the Intermediary Business, there would have been no reason for MCCD to apply the AUM Threshold in any way towards them. Count II thus does not plausibly allege a breach of the Fee Agreement.

Counts III through VII similarly fail because Plaintiff has not shown that the MCCD Products were ever added to the Intermediary Business. Thus, the Fee Agreement did not obligate MCCM to decline to discount fees payable to Plaintiff for purposes of calculating the MCCD Products' Net Revenues (Count III). Neither did it require MCCM to credit Plaintiff the

management fees and performance fees from all MCCD Products investors (Count IV); credit Plaintiff Net Revenues earned by the MCCD exchange-traded funds (Count V); include performance fees in calculating Net Revenues (Count VI); or transfer "the sums outlined in Counts II through VI" to MCCD within fifteen days of receipt (Count VII).  Again, even crediting Plaintiff's allegations that MCCM refused to transfer the MCCD Products' Net Revenues, the Court cannot find that MCCM breached the Fee Agreement without Plaintiff's showing that the MCCD Products were properly added into the Intermediary Business and that MCCM gave permission for the fee transfer.

Plaintiff tries to defeat this conclusion by calling the Fee Agreement ambiguous and arguing that the parties' course of conduct supports his interpretation.  But his misunderstanding of the Fee Agreement's plain terms does not create ambiguity, and the Court may not look at the parties' other conduct when the Fee Agreement states clearly that to be the source of a transfer of Net Revenues, an investment product must have been added to the Intermediary Business by MCCM, which must also consent in writing to that transfer.  *See Cox Commc'ns, Inc. v. T-Mobile US, Inc.*, 273 A.3d 752, 760 (Del. 2022) ("We do not consider extrinsic evidence unless we find that the text is ambiguous.").

### ii.      Count VIII

By contrast, Count VIII adequately pleads sufficient facts to state a claim for breach of the Fee Agreement with respect to Defendants' hiring of Gondola Capital to raise funds for the MCBO I digital asset fund.  Plaintiff alleges that "MCCM breached the Fee Agreement by hiring Gondola Capital to raise assets for MCBO I, hiring Trailmark to conduct sales for [the] digital assets fund, prohibiting Plaintiff and his team from pursuing new investors for MCBO II, and hiring Frontier Solutions, LLC to provide placement agency services and broker-dealer services."

SAC ¶ 243.  Defendants argue that dismissal is warranted because the three placement agents did not work on products that fell within the scope of the Intermediary Business.  Motion at 19.  But, based on the facts alleged and the relevant exhibits, Defendants appear to be correct with respect only to the hiring of Trailmark and Frontier Solutions.

Plaintiff has adequately pleaded that MCCM breached the Fee Agreement by hiring Gondola Capital to fundraise for MCBO I during the approximate period when that product was in the Intermediary Business.  *See* First Amendment § 1; February 2018 Appendix A (referring to MCBO I); SAC ¶¶ 85, 120, 243.  Given MCBO I's addition to Appendix A in February 2018, Plaintiff has plausibly alleged that MCCM was obligated not to circumvent the Fee Agreement and not to "directly or indirectly conduct, manage, operate or participate in" MCBO I other than through MCCD or another entity in which Plaintiff "shall receive the same rights (economic, voting and otherwise) as he would have if such business had been conducted through [MCCD]," as mandated by Section 5(g) and (i).  *See* SAC ¶¶ 240-241.  As further plausibly alleged, by nonetheless hiring Gondola Capital to raise funds for MCBO I, Defendants violated the Fee Agreement.

Defendants' insistence that MCBO I was not added to the Intermediary Business, so MCCM did not violate the Fee Agreement by hiring Gondola, *see* Motion at 19-20; Reply at 5-6, is unpersuasive at this stage.  They point to the asterisk beside MCBO I stating that, "upon each closing of each fund, the parties will update this appendix with a list of all investors in each of the above funds that fall within the scope of Investment Products as certain of the investors in each close may not be included."  February 2018 Appendix A.  Thus, Defendants argue, "only those portions of MCBO I contributed by specifically listed investors" were included in the Intermediary

Business.  Reply at 5.  Because no investors were listed, they reason, "no portion of MCBO I was within the Intermediary Business."  *Id.* at 5-6.

But the significance of the asterisk's terms to MCBO I and the amended Fee Agreement is not so clear.  The First Amendment to the Fee Agreement, to which Appendix A is attached, stated that the Intermediary Business will include "the sales of shares and investment products (collectively, 'Investment Products') listed in Appendix A."  First Amendment § 1.  The February 2018 Appendix A listed MCBO I with an asterisk.  The asterisk's terms did not clearly thwart the addition of MCBO I to the "Investment Products," and, in turn, to the Intermediary Business.  They instead instruct the parties to add more specificity to the document "upon each closing of each fund."  February 2018 Appendix A.  Reading all the facts and inferences in Plaintiff's favor, Plaintiff sufficiently alleges that MCCM's hiring of Gondola Capital breached the Fee Agreement's Overriding Provisions which was meant to protect his position overseeing the Intermediary Business.  The Court therefore denies Defendants' motion to dismiss with respect to Count VIII as it pertains to MCCM hiring Gondola Capital to raise funds for MCBO I.

The same analysis does not apply, however, to the extent that Count VIII alleges that hiring Trailmark and Frontier Solutions breached the Fee Agreement.  Trailmark was hired to be "the primary sales team for the digital asset funds."  SAC ¶ 123.  Frontier Solutions was hired "to provide placement agency services and broker-dealer services."  *Id.* ¶ 243.  But Plaintiff does not allege that either of them worked with any products in the Intermediary Business.  As discussed, *supra* III.B.1.i, the MCCD Products, which included the digital asset funds, were never incorporated into the Intermediary Business, except for MCBO I.  *See* SAC ¶ 83 ("The third category of [MCCD Products] were funds that invested in digital assets.").  And in explaining how Gondola Capital allegedly worked on MCBO I after its incorporation into the Intermediary

Business, in violation of the Fee Agreement, Plaintiff makes no mention of Trailmark or Frontier working on MCBO I or any other product in the Intermediary Business. *See* Opposition at 17. Thus, Count VIII fails to plausibly allege a breach of the Fee Agreement based on Defendant's hiring of Trailmark or Frontier Solutions.

### iii.        Count IX

Count IX brings a claim of breach of contract arising from MCCM's actions in winding down MCCD and its funds. SAC ¶¶ 245-256. This cause of action alleges that MCCM breached the Fee Agreement by "causing MCCD to be wound down," moving the Intermediary Business to another broker-dealer, and "closing certain funds overseen by Plaintiff as MCCD Products," *id.* ¶¶ 252-253; that it breached MCCD's Operating Agreement by "closing down MCCD without Plaintiff's consent as a Member of MCCD," *id.* ¶ 254; and that it breached Appendix A to MCCD's Operating Agreement because the "decision to wind down MCCD" adversely impacted him without first obtaining Plaintiff's written consent, *id.* ¶ 255. *See* Opposition at 17-18. Plaintiff fails to plead sufficient facts to establish Count IX.

Plaintiff does not point to any part of the Fee Agreement or MCCD's Operating Agreement that required his consent before MCCM closed down MCCD. Though the Fee Agreement had a termination clause which required Plaintiff's consent to terminate the Fee Agreement itself, that clause did not address MCCD's wind-down. *See* Fee Agreement § 7. Plaintiff notes that the Operating Agreement's Appendix A required his "prior written consent" before any amendment "adversely impact[s]" him. SAC ¶ 250. But he offers only the conclusory statement that "MCCM's decision to wind down MCCD . . . adversely impacted" him without alleging any facts to show the negative effects on him of that decision. *Id.* ¶ 255. And even though Plaintiff argues that closing MCCD without his consent is a "clear unilateral adverse change" to MCCD's

Operating Agreement, Opposition at 18, he nevertheless fails to point to any contractual provision barring MCCD's wind-down.  He similarly fails to direct the Court to any provision in the Fee Agreement that barred MCCM from closing "funds overseen by Plaintiff as MCCD Products," SAC ¶ 253.  Neither does he allege which parts of the Intermediary Business were moved to another broker dealer.

Because Plaintiff does not plead sufficient facts to "raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, the Court dismisses Count IX.

### iv.    Count XI

Even if this District were the proper venue for Plaintiff's breach-of-contract claim concerning the Commission Agreement, that claim would fail.  *See supra* III.A.  Count XI alleges that "Defendant MCCM breached the Commission Agreement by re-allocating 50% of Plaintiff's commission for the $10 million Virginia Pooled Retirement Fund."  SAC ¶ 267.  But Plaintiff has sued the wrong entity: MCCD, not MCCM, was Plaintiff's counterparty in the Commission Agreement.

Plaintiff's arguments for why MCCM nonetheless is the proper defendant for this claim are unavailing.  First, Plaintiff notes that the Commission Agreement was signed by Yusko as "CEO, [MCCM]."  Opposition at 19; *see* Commission Agreement.  The signed agreement, however, was printed on MCCD letterhead.  The agreement is described as "detail[ing] the commission rates and terms for sales [Plaintiff] make[s] as a registered representative of [MCCD]."  Commission Agreement at 1.  Moreover, the agreement suggests that it could affect other parts of MCCD's operating terms by disclaiming that its terms do "not impact [Plaintiff's] base compensation nor any other terms related to being a member of [MCCD]."  *Id.*

31

Second, Plaintiff argues, "MCCD could only effectuate the payments to Plaintiff if MCCM had honored its obligations under the Fee Agreement in the first place." Opposition at 20. He points to the agreement's statement that MCCD would pay his commissions "coincident with the receipt, in cash, of the related placement fee by [MCCD] from [MCCM]." Commission Agreement, Attachment A at 1; *see* Opposition at 19. Those points give away Plaintiff's argument. In recognizing that *MCCD* would pay the commission after receiving cash transfers from MCCM, Plaintiff acknowledges that it was MCCD, not MCCM, that promised to make payments under the Commission Agreement. MCCM is thus the wrong defendant for Plaintiff's claim alleging breach of the Commission Agreement, so Count XI would be dismissed on its merits even if venue were proper.

### 2.    Tortious Interference

Counts X and XIII allege that Yusko tortiously interfered with the Fee Agreement and the Commission Agreement, respectively. SAC ¶¶ 257-262, 275-279.

The parties do not dispute the choice of law with respect to Plaintiff's tortious-interference claims. Because both apply North Carolina law to those claims, *see* Motion at 21-22; Opposition at 18-19, the Court does the same. *See Chau v. Lewis*, 771 F.3d 118, 126 (2d Cir. 2014) ("The parties' briefs assume that New York law controls, and such implied consent is sufficient to establish choice of law." (cleaned up)). A complaint claiming tortious interference under North Carolina law "must allege: (1) a valid contract existed between the plaintiff and a third person conferring contractual rights to plaintiff against a third person; (2) defendant knew of the contract; (3) the defendant intentionally induced the third person not to perform the contract; (4) in not performing the contract the third person acted without justification; and (5) plaintiff suffered actual damages." *Button v. Level Four Orthotics & Prosthetics, Inc.*, 869 S.E.2d 257, 265 (N.C. 2022). A corporate officer enjoys a "qualified privilege leading to a presumption that he or she acted in

the corporation's best interest," and, therefore, that the fourth element was not met. *Id.* An officer's "actions, then, are presumed justified." *Id.* That presumption can be overcome only by showing that the officer acted with malice, so "the claimant must allege facts demonstrating that the defendant's actions were not prompted by legitimate business purposes." *Id.* (cleaned up). The defendant must have instead acted in his own personal interest. *Id.* "General allegations" of malicious conduct are insufficient, and the complaint must allege facts showing "no motive for interference other than malice" in order to survive dismissal. *Id.* (cleaned up).

The Second Amended Complaint falls far short of pleading that Yusko, a corporate officer of Morgan Creek, tortiously interfered with either agreement.

Count X seeks to hold Yusko liable for inducing MCCM to breach the Fee Agreement. Even if Plaintiff could plead sufficient facts to establish that MCCM breached that agreement in the many ways he describes, *see* SAC ¶ 261, he has not adequately pleaded Yusko's liability for tortiously interfering with the Fee Agreement as it relates to that breach. Plaintiff's Second Amended Complaint merely recites the legal standard for liability and rehashes his assertion that MCCM breached the Fee Agreement. *Id.* ¶¶ 258-261. Without alleging any facts showing that Yusko "acted in [his] own personal interest," *Button*, 869 S.E.2d at 265, Plaintiff does not overcome North Carolina law's presumption that a corporate officer's actions are justified.

Count XIII, which alleges Yusko's tortious interference with the Commission Agreement, fails on its merits for similar reasons. Plaintiff does not present any facts that show that Yusko acted in his own personal interest when he credited Plaintiff with just 50% of the commission arising from the deal with the Virginia Pooled Retirement Fund. *See* SAC ¶ 278. On the contrary, based on Plaintiff's allegations, the main beneficiary of Yusko's decision appears to have been the junior analyst to whom he directed the other 50% of the commission. *See id.* ¶¶ 130, 278.

The Court thus dismisses Plaintiff's tortious-interference claims in Counts X and XIII for failure to state a claim.

### 3.    Promissory Estoppel

Count XII seeks damages under a promissory-estoppel theory to compensate Plaintiff for relying on Yusko's alleged promise to pay him commissions after he left Morgan Creek.  SAC ¶¶ 269-274.  As a threshold matter, the parties dispute whether North Carolina or New York law governs this claim.  "A federal court sitting in diversity must apply the choice of law rules of the forum state."  *Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 641 (2d Cir. 2016) (cleaned up).  Under New York choice-of-law rules, in the absence of an express choice-of-law clause, the first step in any dispute presenting a potential choice-of-law issue is "to determine whether there is an actual conflict between the laws of the jurisdictions involved."  *Id.* (cleaned up).  If an actual conflict exists, "courts will apply the laws of the state that has the most significant relationship to the transaction and the parties."  *John Wiley & Sons, Inc. v. DRK Photo*, 882 F.3d 394, 412 (2d Cir. 2018) (cleaned up).

Defendants argue that North Carolina law applies and renders this claim dead on arrival because North Carolina recognizes promissory estoppel only as a defense, not as a standalone cause of action.  *See Home Elec. Co. of Lenoir, Inc. v. Hall & Underdown Heating & Air Conditioning Co.*, 358 S.E.2d 539, 541 (N.C. Ct. App. 1987), *aff'd*, 366 S.E.2d 441 (Mem) (N.C. 1988) (per curiam); *see* Motion at 24-25.  Plaintiff contends that the claim is governed by New York law, which recognizes an affirmative promissory-estoppel claim.  *See* Opposition at 20-21.

The Court need not resolve the choice-of-law dispute because Count XII fails under both analyses.  North Carolina law does not provide this kind of cause of action, *Home Elec. Co. of Lenoir*, 358 S.E.2d at 541, and Plaintiff fails to allege sufficient facts to plead a plausible claim under New York law, *see Iqbal*, 556 U.S. at 678.  To establish promissory estoppel under New

York law, Plaintiff "must establish: 'a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and an injury sustained by the party asserting the estoppel by reason of his reliance.'" *Avne Sys., Ltd. v. Marketsource Corp.*, No. 99 Civ. 11220 (JSR), 2000 WL 1036035, at *1 (S.D.N.Y. July 27, 2000) (quoting *Esquire Radio & Elecs., Inc. v. Montgomery Ward & Co., Inc.*, 804 F.2d 787, 793 (2d Cir. 1986)). But quasi-contract theories of recovery such as promissory estoppel are "unavailable where an express contract covers the subject matter." *City of Yonkers v. Otis Elevator Co.*, 844 F.2d 42, 48 (2d Cir. 1988); *see Karmilowicz v. Hartford Fin. Servs. Grp., Inc.*, 494 F. App'x 153, 157 (2d Cir. 2012). Courts may permit a promissory-estoppel claim when it is pleaded in the alternative to a breach-of-contract claim, but not when it is "simply meant to hold the defendant to its contractual promise." *Morelli v. Patient Safety Techs., Inc.*, No. CV 15-4162, 2015 WL 13047564, at *6 (C.D. Cal. Dec. 22, 2015) (applying New York law). Otherwise, the promissory-estoppel theory simply duplicates the breach-of-contract claim.

Plaintiff's promissory-estoppel claim fails as to both Yusko and MCCM because, as alleged, Yusko promised only to comply with an existing contract, *i.e.*, the Commission Agreement. The Second Amended Complaint alleges that Yusko said that Plaintiff "would continue to receive the quarterly commissions *he was owed under the Commission Agreement*." SAC ¶ 270 (emphasis added); *see id.* ¶ 173 ("Yusko had agreed to allow Plaintiff and his team members to receive the quarterly commissions they *were owed*." (emphasis added)). Therefore the express terms of that contract govern, and the appropriate claim to enforce those terms would be through a claim of breach of contract, not promissory estoppel. *See City of Yonkers*, 844 F.2d at 48; *Karmilowicz*, 494 F. App'x at 157.

Plaintiff's attempt to salvage this claim is unavailing. He claims that the Commission Agreement entitles Plaintiff to "a portion" of his commissions after he stops serving as a registered representative of MCCD, Opposition at 21 (emphasis omitted), while "Yusko's promise was not limited to only a portion of Plaintiff's commissions," *id.* at 21-22. But that is not what the Second Amended Complaint alleges, and it is "well settled that plaintiffs cannot amend their complaint by asserting new facts or theories for the first time in opposition to a defendant's motion to dismiss," *Travelers Indem. Co. v. U.S. Fire Ins. Co.*, No. 22 Civ. 6440 (MKV), 2024 WL 295355, at *4 (S.D.N.Y. Jan. 25, 2024) (cleaned up). The Second Amended Complaint alleges only that Yusko promised to pay Plaintiff "the quarterly commission he was owed under the Commission Agreement." SAC ¶ 270; *accord id.* ¶ 173 (alleging that "Yusko agreed to allow Plaintiff and his team members to receive the quarterly commissions they were owed while at Exos"). That alleged promise did not commit Yusko or MCCM to anything beyond what the Commission Agreement required. Plaintiff merely seeks to enforce that agreement, so Count XII fails under New York law.

Because Count XII would fail to state a claim under both North Carolina and New York law, the Court dismisses it.

### 4.    Counts I and XIV

Though Defendants purport to move to "dismiss[] all claims made by Plaintiff," Dkt. 22 (Notice of Motion to Dismiss) at 1, their moving brief does not make any arguments about Count I, which seeks a declaratory judgment addressing MCCM's obligations under the Fee Agreement, and Count XIV, which alleges that MCCM breached its duty of good faith and fair dealing in applying the AUM Threshold, *see generally* Motion. To the extent Defendant makes an argument about Count XIV in its Reply, *see* Reply at 6, the Court declines to consider it. *See Valerio v. City of New York*, No. 18 Civ. 11130 (JPO), 2020 WL 353749, at *5 (S.D.N.Y. Jan. 21, 2020) (declining

to address an argument because "courts generally should not consider arguments raised for the first time in a reply brief" (cleaned up)).  Because the movant bears the burden at this stage, *Alce v. Wise Foods, Inc.*, No. 17 Civ. 2402 (NRB), 2018 WL 1737750, at *2 (S.D.N.Y. Mar. 27, 2018), the Court will not dismiss Counts I and XIV in the absence of appropriate briefing from Defendants.  *See Evans v. USA Bobsled & Skeleton Fed'n*, No. 8:23-CV-1429 (MAD/CFH), 2024 WL 4120716, at *19 n.6 (N.D.N.Y. Sept. 9, 2024) (concluding that an argument stated only in a footnote was insufficiently briefed and declining to consider it as a basis for dismissal); *see also Phoenix Light SF Ltd. v. Bank of N.Y. Mellon*, No. 14 Civ. 10104 (VEC), 2017 WL 3973951, at *20 n.36 (S.D.N.Y. Sept. 7, 2017) ("Merely mentioning or simply stating an issue is insufficient because a litigant must advance an argument, and courts generally will decline to consider issues that are not sufficiently argued." (cleaned up)); *cf. Tolbert v. Queens College*, 242 F.3d 58, 75 (2d Cir. 2001) ("It is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (cleaned up)).

Thus, the Court denies Defendants' motion to dismiss Counts I and XIV.

## IV.  Conclusion

For the foregoing reasons, the Court grants Defendants' motion in part and dismisses Counts II, III, IV, V, VI, IX, XI, and XII with prejudice.[15]  *See Nano Dimension Ltd. v. Murchinson Ltd.*, 102 F.4th 136, 143 n.8 (2d Cir. 2024) (affirming dismissal with prejudice where the plaintiff "did not request leave to re-plead and has failed to articulate how any additional allegations could correct the substantive deficiencies identified by the district court in dismissing its amended

---

[15] Because Plaintiff has not requested leave to amend or explained how he would seek to cure the deficiencies identified herein, the Court does not *sua sponte* grant leave to amend.  *See Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) ("[N]o court can be said to have erred in failing to grant a request [for leave to amend] that was not made.").

complaint"). Counts VII, X, and XIII are dismissed without prejudice given the possibility that these claims could be pleaded with additional facts that would render them legally viable. The Court denies the motion to dismiss with respect to Counts I, VIII, and XIV.

Defendants shall file an answer to Counts I, VIII, and XIV by October 14, 2025. *See* Fed. R. Civ. P. 12(a)(4). The Court will issue a separate order scheduling an initial pretrial conference. The Clerk of the Court is respectfully directed to close Docket Number 22.

SO ORDERED.

Dated: September 30, 2025
      New York, New York

                                    JOHN P. CRONAN
                            United States District Judge